# Exhibit 9, Part 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX<br>REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

## REBUTTAL REPORT OF EMRE CARR, PH.D., CFA

Emre Carr, Ph.D., CFA

February 1, 2022

**CONFIDENTIAL**

**Rebuttal Report of Emre Carr, Ph.D., CFA**

## TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................................... 3
     A.      Assignment and Scope ......................................................................................... 3
     B.      Information Relied Upon ...................................................................................... 3
     C.      Summary of Opinions ........................................................................................... 4

II.     THE PENSION PLAN STRATEGY WAS A STRUCTURED TRANSACTION
    THAT REQUIRED SUCCESSFUL EXECUTION OF ALL OF THE STOCK,
    STOCK LOAN, AND HEDGING TRANSACTIONS ............................................... 9

III.    THE SKAT EXPERTS MISLEADINGLY STATE THAT THE STRUCTURED
    NATURE OF PENSION PLAN TRADES IS EVIDENCE THAT THEY ARE
    FICTITIOUS ............................................................................................................. 12

IV.    THE ANALYZED TRANSACTIONS FOLLOWED NUMEROUS ACCEPTED
    MARKET PRACTICES AND ARE NOT FAKE SIMPLY BECAUSE OF THE
    USE OF ANY NON-STANDARD TERMS ............................................................. 16
     A.      Both Stock and Flex Futures Trading Followed Accepted Market Practices
        and IDBs Earned Commission On Their Trades .......................................... 17
     B.      Securities Lending .......................................................................................... 30

V.      BOTH MR. DUBINSKY AND MR. WADE CONSIDER INFORMATION NOT
    AVAILABLE TO THE PENSION PLANS ............................................................. 34

VI.    CUM-CUM AND CUM-EX TRANSACTIONS LEAD TO THE SAME
    ECONOMIC EXPOSURE FOR A PENSION PLAN; SUBSTITUTE DIVIDEND
    PAYMENTS DO NOT MEAN THAT A TRANSACTION IS FABRICATED ...... 36

VII.   SKAT EXPERTS' REPEATED ASSERTIONS OF PURPORTEDLY "CIRCULAR"
    TRANSACTIONS DO NOT DEMONSTRATE THAT THE PENSION PLAN
    TRANSACTIONS WERE "FAKE" ........................................................................ 42

VIII.  GIVEN THE OFFSETTING TRADES BY SOLO'S CLIENTS, THE NET SHARE
    HOLDINGS IN SOLO'S SUB-CUSTODIAN ACCOUNT DO NOT
    DEMONSTRATE THAT THE PENSION PLANS DID NOT EXECUTE TRADES
    IN DANISH STOCKS ............................................................................................. 46

IX.     CONCLUSION ......................................................................................................... 50

Rebuttal Report of Emre Carr, Ph.D., CFA

## List of Exhibits to This Report

Exhibit 1……………………………………………………………….Materials Relied Upon

Exhibit 2………..Mr. Dubinsky Misrepresents the Trade Approval Issued under the Give-up Agreement to be the Trade Confirmation

Exhibit 3.............................Contrary to Mr. Wade's Assertion, Futures Contracts Expiring in September have Different Prices from the Futures Contracts Expiring in December

## List of Figures

Figure 1……………….....….The RJM Plan 2013 Transactions Related To MAERSKB Stock

Figure 2……………………...……Trade Confirmation from FGC Securities to the RJM Plan

Figure 3………………..……Solo's Acknowledgement of Transaction sent to the RJM Plan

Figure 4…………………….……….Solo's Approval of Transaction sent to the RJM Plan

Figure 5…………… Flex Futures Trade Confirmation from FGC Securities to the RJM Plan

Figure 6…………………………………Dividend Credit Advice from Solo to the RJM Plan

Figure 7…..Replication of Dubinsky Report Figure 15 (Bernina Pension Plan Transaction in Carlsberg Stock)

Figure 8…..…..Replication of Dubinsky Report Figure 15 with Additional Borrowing Party

Figure 9…..Replication of Dubinsky Report Figure 15 with Additional Borrowing Party and Additional Lending Party

# I.  INTRODUCTION

## A.  Assignment and Scope

1.  I have been retained by counsel to certain Defendants to review trades in Danish securities and associated instruments conducted by certain U.S.-based pension plans in connection with the above-captioned multidistrict litigation, *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-02865 (LAK).

2.  Counsel has asked me to review two reports submitted by experts ("SKAT Experts") retained on behalf of Skatteforvaltningen ("SKAT").  The two reports are:

    a.  Expert Report of Bruce G. Dubinsky dated December 31, 2021 ("Dubinsky Report")

    b.  Expert Report of Graham Wade dated December 31, 2021 ("Wade Report")

3.  I have been asked to review the analyses in the two reports that relate to those pension plan trades that used one of the following four custodians: Solo Capital ("Solo"), Telesto Markets LLP ("Telesto"), Old Park Lane Capital PLC ("Old Park Lane"), and West Point Derivatives Limited ("West Point").  Mr. Dubinsky refers to these four custodians as "Solo Custodians" and, for the Court's convenience, I adopt the same terminology.[1]

## B.  Information Relied Upon

4.  In performing my analyses and in forming my opinions and conclusions, I have relied upon data and information from various sources, all of which are reasonably relied upon by experts in my field.  In addition to the materials I considered in connection with my opening report, additional materials I have considered in preparing this Rebuttal Report are set forth in **Exhibit 1**.  Additionally, I considered the materials cited in both the Dubinsky and Wade Reports.  I have also relied upon

---

[1] Dubinsky Report ¶19.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

my professional experience and expertise obtained over many years as a professional economist. I am prepared to amend and expand my analyses if I consider it necessary after receiving further information regarding this action.

5.  Regarding any anticipated trial testimony in this action, I may use various documents produced in this litigation that refer to or relate to the matters discussed in this report. Although I may cite to a particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant for my analyses in this matter. In addition, citations to a document or documents are intended to be illustrative and are not exhaustive. Further, I may create or assist in the creation of certain demonstrative schedules to assist me in testifying. To date, I have yet to create such demonstratives.

### C.    Summary of Opinions

6.  The SKAT Experts repeatedly characterize the pension plans' various transactions as "fake"[2] or "fictitious."[3] By way of example, the SKAT Experts make sweeping characterizations of "massive WHT fraud orchestrated by Solo Capital,"[4] "thousands of fictitious stock transactions,"[5] "the entire trading loop was fictitious,"[6] the "Solo trades were fake,"[7] and "The Purported Trades were Completely Fake."[8] But importantly, the SKAT Experts' analyses fail to demonstrate that the transactions were, indeed, not real.

---

[2] *See, e.g.*, Dubinsky Report ¶203; Wade Report ¶16.

[3] *See, e.g.*, Dubinsky Report ¶122; Wade Report ¶225.

[4] *Id.* at ¶122.

[5] *Id.*

[6] *Id.* at ¶197.

[7] *Id.* at ¶203.

[8] Wade Report, p. 96.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

7.   A pension plan's economic exposure to a stock (including a claim to dividend[9]) started as soon as the trade was executed, and the pension plans received confirmations informing them that their stock purchases were executed. The confirmations were issued by regulated inter-dealer brokers ("IDBs). Further, almost all securities in Denmark are dematerialized and security holdings and transfers are tracked through book entries at the client account level that are reflected in their statements.[10] The pension plan account statements showed that the trades settled and the shares were held by the custodian in the plan's account. In their analyses, the SKAT Experts assert, without basis, that the trade confirmations issued by the IDBs, were "simply camouflage"[11] and that IDBs such as "FGC Securities LLC has no apparent business purpose other than to create an air of legitimacy to the trade."[12] Additionally, the SKAT Experts ignore the account statements issued by the Solo Custodians that show the pension plans' transactions and holdings.

8.   As discussed in more detail throughout this report, my opinions include the following:[13]

   a.   The Pension Plan Strategy[14] was a structured transaction with the potential to generate significant profits with mitigated risks. Structured transactions are commonly used, particularly for multi-legged transactions and for purposes of engaging in arbitrage, such as the dividend arbitrage strategy used by the

---

[9] As used herein, the term "dividend" refers to the per-share amount declared by the issuer. The term encompasses both what the SKAT Experts label a "real dividend"—*i.e.*, where the payment originates from the issuer of the securities and flows through a chain of custody to one or more custodians—and "substitute" dividend payments where the payment is made to compensate investors that did not receive a dividend through the chain of custody despite being entitled to it.

[10] Expert Report of Emre Carr, Ph.D., CFA, dated December 31, 2021 (hereinafter "Initial Carr Report") ¶¶28-29.

[11] Wade Report p. 45.

[12] Dubinsky Report ¶162.

[13] Several of the SKAT Experts' statements are irrelevant to the question of whether the pension plan trades were real. The fact that I do not address a particular statement should not be understood to mean that I agree with that statement.

[14] I use "Pension Plan Strategy" as I did in my opening report to describe the tax-advantaged trading strategy that aimed to generate profits from market participants' tax differentials on dividends while managing the price risk of the underlying shares. *See* Initial Carr Report, Section II.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

pension plans. Starting in approximately early 2015, an automated system that was developed by Solo was used to facilitate the execution of certain trades. The use of structured transactions facilitated by an automated system does not indicate that the trades executed by the pension plans were "fictitious."

b. The Pension Plan Strategy trades were in large volumes and executed over-the-counter ("OTC") rather than on an exchange. Trading OTC is a widely-accepted market practice, particularly for large trades, and is not suspicious or inherently fraudulent. In Europe, OTC trades of trillions of euros are reported every year.[15]

c. The Analyzed Transactions followed numerous other accepted market practices, as evidenced by the use of industry-standard templates underlying various agreements, trade acknowledgments, approvals, and confirmations. The pension plans used an industry-standard template for give-up agreements related to the trade executions and the industry-standard Global Master Securities Lending Agreement ("GMSLA") template for their stock lending transactions. The pension plans paid commissions to the IDBs and custodians.

d. Mr. Wade repeatedly claims that the transactions had "unusual" or "irregular" terms and they were not the "market standard."[16] First of all, these claims do not speak to the legitimacy of the trades because a purportedly "unusual" transaction term does not make a transaction fake. Second, Mr. Wade implicitly asserts that standards from the marketplaces for standardized transactions apply to the OTC markets. As Mr. Wade acknowledges, the OTC transactions are "bespoke" transactions.[17] Given the

---

[15] ESMA, "EU Securities Markets: ESMA Annual Statistical Report," November 2020, p. 6, *available at* https://www.esma.europa.eu/sites/default/files/library/esma50-165-1355_mifid_asr.pdf (last accessed on January 17, 2022).

[16] *See, e.g.*, Wade Report ¶¶ 16 and 241.

[17] *Id.* at ¶90.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

"bespoke" nature of the transactions, there is no reason that the transactions should, much less must, conform to Mr. Wade's view of purported standard market practices.

e.  An investor's receipt of substitute dividend payments does not provide support for the SKAT Experts' assertions that the pension plan transactions were fabricated. From an economic perspective, a tax-exempt investor like a pension plan buying shares prior to an ex-dividend date has a claim to the same amount irrespective of whether the amount is labeled as a "real" or "substitute" dividend. Further, even the payment sourced from an issuer may be labeled as "real" or "substitute." For example, a purchaser in a Cum-Cum trade that fails to settle on time and settles after the dividend record date will receive the same amount that the purchaser would have received had the trade settlement not been delayed. The only difference is that the amount received when a trade settles after the record date will be labeled a "substitute dividend" instead of a "real dividend" (as would have been the case without a settlement delay). Mr. Wade conflates an analysis of whether dividends are real versus substitute with an analysis of whether the underlying transactions are real or are fictitious. The treatment of dividends in a transaction depends on its terms and operational details, such as the one discussed above for the Cum-Cum trade and do not constitute a basis in determining whether the transactions are real or fictitious.

f.  The SKAT Experts ignore that an investor's economic exposure to a stock starts when the trade is confirmed and is not impacted by how the custodian settled the trades or the identities of counterparties to those trades.

g.  The SKAT Experts' repeated assertions of purportedly "circular" transactions do not demonstrate that the pension plan transactions were fake. In fact, the SKAT Experts do not define what they mean by circular. Often they just present figures showing a series of transactions, some of which are between parties outside this litigation, that they connect with arrows purportedly

**Rebuttal Report of Emre Carr, Ph.D., CFA**

completing a circle.   Relatedly, the SKAT Experts also assert that "the very same shares" were used in the various legs of the purported circular transactions.[18]  As shares are dematerialized, it does not make sense to talk about the "very same shares" without examining what other transactions the entities involved in those transactions might have undertaken.  Furthermore, the SKAT Experts do not provide any evidence demonstrating that the pension plans were aware of the transactions to which they were not a party or the identity of the counterparties in those transactions.  The pension plans' trade confirmations from IDBs and account statements from Solo did not provide information about the other side of their stock and futures trades.

h.  Mr. Wade repeatedly asserts that some transactions were not arm's-length. Mr. Wade has not defined what he means by arm's-length.  Simply because a transaction is not arm's-length –something not established here -- does not mean that it is a fake transaction.[19]  For example, almost all transactions between a company and its subsidiary are related party transactions that may or may not have arm's-length terms.

i.  Mr. Dubinsky's failure to locate Danish shares at the Solo sub-custodians is not sufficient to demonstrate that the pension plan trades were fake.  Because shares in Danish companies are dematerialized, the quantities of shares held in a given stock across all transactions would be reflected in the pension plans' accounts as electronic book entries, and the entries for offsetting transactions involving the same number of shares would net to zero.  Mr. Dubinsky fails to show that these electronic book entries are "fictitious."

---

[18] *See, e.g.*, Dubinsky Report ¶17, and Wade Report ¶128.

[19] I assume that Mr. Wade is referring to a transaction conducted between a willing buyer and a willing seller, acting independently and pursuing their own best interests.

Rebuttal Report of Emre Carr, Ph.D., CFA

## II.    THE PENSION PLAN STRATEGY WAS A STRUCTURED TRANSACTION THAT REQUIRED SUCCESSFUL EXECUTION OF ALL OF THE STOCK, STOCK LOAN, AND HEDGING TRANSACTIONS

9.    As I explained in the Initial Carr Report, the Pension Plan Strategy involved numerous transactions by the pension plans and is an example of a structured finance transaction.  Structured transactions, especially complex ones, are facilitated by financial intermediaries.[20]  A 2007 interagency statement from the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, Office of Thrift Supervision, and U.S. Securities and Exchange Commission describes complex structured finance activities as follows:

> *When a financial institution participates in a complex structured finance transaction ("CSFT"), it **bears the usual market, credit, and operational risks** associated with the transaction.  In some circumstances, a financial institution also may face **heightened legal or reputational risks** due to its involvement in a CSFT. … The documentation that financial institutions use to support CSFTs is often **highly customized for individual transactions and negotiated with the customer.**[21]*

10.    The pension plans engaged in a hedged dividend capture strategy, a type of dividend arbitrage strategy commonly pursued by tax-advantaged investors.[22]  Academic research finds that investors have commonly employed dividend arbitrage strategies

---

[20] I note that it is not unusual for a broker to be active in facilitating investors' trades even when they are not complex.  For example, when companies offer shares in initial public offerings or secondary offerings, brokers establish the allocations of those shares to various investors before the offering is closed.

[21] U.S. Securities and Exchange Commission, "Interagency Statement on Sound Practices Concerning Elevated Risk Complex Structured Finance Activities," effective January 11, 2007, *available at* https://www.sec.gov/rules/policy/2007/34-55043.pdf (last accessed on January 31, 2022) (emphasis added). The original policy statement issued in 2004 seeking public comment stated that complex structured finance transactions "typically result in a **final product that is often non-standard**" and "often involve professionals from multiple disciplines within the financial institution and may **have significant fees** or high returns in relation to the market and credit risks associated with the transaction."  U.S. Securities and Exchange Commission, "Policy Statement: Interagency Statement on Sound Practices Concerning Complex Structured Finance Activities," section titled ""II. DEFINITION AND KEY RISKS OF COMPLEX STRUCTURED FINANCE TRANSACTIONS," *available at* https://www.sec.gov/rules/policy/34-49695.htm (last accessed on January 23, 2022) (emphasis added).

[22] *See* Initial Carr Report, Section II.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

for decades in numerous countries such as the United States, Australia, Japan, Italy, Finland, and Taiwan.[23]

11.  As examples of the Pension Plan Strategy, the Analyzed Transactions I described in the Initial Carr Report involved numerous transactions serving different purposes, namely, (i) the pension plan's  initial purchase of shares prior to the ex-dividend date to gain claim to an amount equal to the forthcoming dividend; (ii) stock loans to finance the purchase of those shares; (iii) execution of flex futures or forward contracts that gave the pension plan the right to sell the shares at a specified price in the future to hedge the price risk; and (iv) a later unwind of the purchase of shares, the stock loan, and the hedging contracts.

12.  For example, see **Figure 1** below, taken from the Initial Carr Report.[24]  This figure illustrates various transactions related to the RJM Plan's hedged dividend capture of MAERSKB stock.  As shown below, in April 2013, the RJM Plan purchased shares in MAERSKB and sold flex futures contracts on a cum-dividend date, which was one day before the ex-dividend date.[25]  One day after the dividend record date, the equity purchase settled, and the RJM Plan loaned its purchased shares, executing the stock lending transaction on the same day that the equity purchase settled.  The RJM Plan unwound the transaction in June 2013 by recalling the loaned shares, selling those recalled shares, and then purchasing flex futures with the same expiration as the contracts that were previously sold.

---

[23] Initial Carr Report Section VII.

[24] *Id.* at Figure 2.

[25] *Id.* at n. 13 ("The ex-dividend date is the date as of which purchasers of stock do not have a claim to the forthcoming dividend declared at the issuer's most recent Annual General Meeting.").  The date at which a company eventually issues the payment is called "Dividend Pay Date."

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 1: The RJM Plan 2013 Transactions Related To MAERSKB Stock**[26]



13. In practice, to pursue the Pension Plan Strategy, pension plans faced several risks, including price risk, liquidity risk and financing risk.  A significant stock price decline over the holding period due to reasons unrelated to dividend preferences can more than offset an investor's profits from the dividend capture.  The inability to find liquidity for stock purchases or hedging contracts can adversely impact a structured transaction and its profitability.[27]  And here, a failure to find a counterparty willing to enter into the stock lending transaction would have caused the Pension Plan Strategy to fall apart due to lack of financing.

14. Not surprisingly, pension plans like the RJM Plan and Proper Pacific Plan used their custodians, Solo and Old Park Lane, to successfully implement the Pension Plan Strategy.

---

[26] Dividend dates from Bloomberg, L.P., as shown in Initial Carr Report, Exhibit 14.  Transaction dates from trading documents, as described in the Initial Carr Report ¶¶154-162.

[27] Because the volume of trades is large (as was the case for the pension plan trades), trading OTC allows an investor to minimize the potential price impact of the trades.  However, successful execution in the OTC market is not guaranteed.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

15. As discussed in the Initial Carr Report, Solo and Old Park Lane were both registered with the U.K. regulator, the Financial Conduct Authority ("FCA"), at the time of the Analyzed Transactions, and as such were subject to its handbook of rules and guidance, particularly as it applied to broker-dealers and custodians.[28]  The IDBs that executed the Analyzed Transactions were also registered with the relevant regulators.[29]

16. In short, the various transactions related to the Pension Plan Strategy together formed a complex structured transaction that met the financial objective of the pension plans, and, therefore, it is not surprising that the pension plans took steps to minimize the execution risk of its hedged dividend capture transactions for various stocks.

## III.    THE SKAT EXPERTS MISLEADINGLY STATE THAT THE STRUCTURED NATURE OF PENSION PLAN TRADES IS EVIDENCE THAT THEY ARE FICTITIOUS

17. The SKAT Experts assert that the structured nature of the pension plan trades and the involvement of the Solo Custodians in arranging the trades are evidence that the trades were fake.[30]

18. At the outset, I note that the SKAT Experts' dismissive statements about the structured nature of the transactions do not address, one way or another, whether the Plans owned any shares in Danish companies.  If the Solo Custodians' role in locating liquidity for trades in the market is evidence that those trades are fake, then

---

[28] Initial Carr Report n.49 (citing FCA, "The Financial Services Register," available at https://register.fca.org.uk/s/firm?id=001b000000NMaqQAAT and https://register.fca.org.uk/s/firm?id=001b000000MgBgIAAV) (last accessed December 29, 2021).

[29] Financial Industry Regulatory Authority, Inc., "FGC Securities, LLC," *available at* https://brokercheck.finra.org/firm/summary/158399 (last accessed on February 1, 2022); Financial Conduct Authority, "Bastion Capital London Ltd," *available at* https://register.fca.org.uk/s/firm?id=001b000000MfPpoAAF (last accessed on February 1, 2022).

[30] *See, e.g.*, Dubinsky Report ¶16; Wade Report p.89, Opinion 5.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

the vast majority, if not all, of the trillions of euros of OTC trades reported every year[31] would be fake, according to the SKAT Experts.

19. Mr. Wade also asserts that the trades were highly irregular and purportedly not arm's-length due to the assistance from the Solo Custodians.[32] Similarly, Mr. Dubinsky asserts that "Solo Capital pre-arranged the entire structure of the transactions," and that "the Plans had no ability to negotiate the financial terms of the arrangement."[33]

20. Simply because an intermediary facilitates a transaction does not mean that the transaction is not an arm's-length transaction. For example, numerous real estate transactions are facilitated by the same broker representing both the buyer and seller. It would be incorrect to call these transactions not arm's-length because they are intermediated by a broker. Even if these real estate transactions could be called not arm's length, it will be incorrect to call them fake. Mr. Dubinsky's assertion about the plans not having an ability to negotiate the financial terms is also nothing more than his *ipse dixit* since he provides no evidence (*e.g.*, documentation of negotiations between Solo and the pension plans) to support his assertion.

21. As Mr. Wade notes, Solo developed "Brokermesh," a custom platform that facilitated order routing and matched counterparties offering or seeking liquidity,

---

[31] ESMA, "EU Securities Markets: ESMA Annual Statistical Report," November 2020, p. 6, *available at* https://www.esma.europa.eu/sites/default/files/library/esma50-165-1355_mifid_asr.pdf (last accessed on January 17, 2022).

[32] *See, e.g.*, Wade Report ¶241 ("With the Solo trades, purported traders working for the Solo Pension Plans would receive instructions from Solo with directions on which shares each Plan was to trade, trade volumes, and trade counterparties. This is highly irregular and means that the purported trades were not at arm's-length.")

[33] Dubinsky Report, p.79.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

and made the system available to certain clients and broker firms in approximately early 2015.[34]

22.  Mr. Wade asserts that the use of Brokermesh is "highly irregular and further evidence that these transactions were fake."[35]  Automation is a common tool and automation of order entry or routing is not evidence that the trades were fake.[36] Given numerous structured transactions by the pension plans and potentially by its other customers, it seems reasonable that Solo took steps to automate the process.[37]

23.  Mr. Wade asserts that "[i]t is inconceivable to me that these IDBs (*i.e.*, those using Brokermesh) were genuinely able to provide **instant access** to liquidity equal to more than the ADTV of the shares in question."[38]  Contrary to Mr. Wade's assertion,

---

[34] Wade Report ¶242.  *See also* Financial Conduct Authority, Final Notice to Sapien Capital Limited, May 6, 2021, *available at* https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf (last accessed on January 17, 2022) ¶4.114 ("Brokermesh was an electronic platform, developed by an entity associated with the Solo Group, which generated trade orders from clients which were transmitted to brokers, including to Sapien. The purported trading on the platform was conducted via an automated process whereby once an order appeared on the system, a broker would seek liquidity from the Solo Clients available on the system. Then, once the liquidity was established, the order would be matched subject to trade authorisation from the relevant custodian.").

[35] *Id.* at ¶16.

[36] *See, e.g.*, Wade Report ¶242 ("It is not uncommon for some hedge funds to build sophisticated trade automation systems and many high-frequency hedge funds delegate trading entirely to algorithms.").

[37] Mr. Wade says that "[t]he Brokermesh system appears to have generated emails purporting to be from one firm to another firm or from Solo to various firms offering trades and then confirming them."  Wade Report ¶242.  But simply because the record keeping in the automated platform that the pension plans used is not "regular" in Mr. Wade's view is not evidence that the pension plan trades were fake.

[38] Wade Report ¶243 (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

Sunrise Brokers, one of the IDBs, "said that they would **not** get responses **instantaneously** on Brokermesh."[39]

24.     He also ignores that the brokers were sometimes unable to find liquidity for the plan trades despite automation.  For example, one of the FCA notices that Mr. Wade cites notes that Sunrise "accepted all [Solo] trade orders on Brokermesh but **liquidity was not always found and some orders were not matched**."[40]

25.     Even before the automation, it seems that liquidity was not always found.  For example, the executing broker could not find liquidity for a March 8, 2013, request by the Mill River Capital Management Pension Plan for Coloplast A/S stock trades.[41]

26.     While discussing what he describes as "the pre-arranged bulk nature of the Solo Trades," Mr. Dubinsky also asserts that "the transactions were not custom tailored to

---

[39] Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶4.125, *available at* https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf (last accessed on January 17, 2022) (emphasis added).  Relatedly, I note that Mr. Wade reports Average Daily Trading Volume ("ADTV") and maximum daily trading volume ("max DTV") for various Danish securities in Appendix D to his report.  Mr. Wade's ADTV calculations fail to incorporate any volume of OTC trading and thus understate the ADTV and maximum DTV.  There is a large amount of OTC trading volume in Europe, including the UK.  For example, off-book, off-exchange (*i.e.*, OTC trades that are reported) average trading volume in December 2013 for Cboe Europe APA (UK) was 1,074,187,297.  *See* Cboe, European Equities Market Share by Market, as of December 31, 2013, *available at* https://www.cboe.com/europe/equities/market_share/market/off-book/2013-12-31/#dm=tbnnav&dr=mtd&mt=1&ms=0&hc=1&f=0&ID=515770de6ebe755a2fe7&V=88e178cff5ed72b217b0 (last accessed on January 26, 2022).  Cboe Europe APA accounts for the majority of European OTC trading.  Cboe Europe describes itself as "the largest truly pan-European equities exchange by market share and value traded, offering trading in securities from 18 markets" and explains that "[t]hrough our exchanges in the Netherlands (Cboe NL) and the UK (Cboe UK) we operate a range of equity trading mechanisms to allow our clients to trade in a way that suits them. We operate Europe's largest Approved Publication Arrangement (APA) for the reporting of OTC equity trades … [O]ur Approved Publication Arrangement (APA) handles around 75% to 80% of all equity APA reports …." Cboe, "Our Vision for EU Equity Market Structure Reform," 2021, *available at* https://cdn.cboe.com/resources/participant_resources/KeyMiFIDIIViews_0521.pdf (last accessed on January 26, 2022).

[40] Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶4.125 (emphasis added), *available at* https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf (last accessed on January 17, 2022).  Mr. Wade seems to be aware of this fact.  *See* Wade Report n. 197 (citing FCA Sunrise Notice ¶4.125).

[41] MPSKAT00072484.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

each Plan based upon their own risk profile, investment strategy or time horizon."[42] Mr. Dubinsky does not explain how the absence of "custom tailoring" to each plan's risk profile, investment strategy, or time horizon is evidence of the trade being fake. His observation about the risk profile is nothing more than his *ipse dixit* because he does not explain how the use of the Pension Plan Strategy in a particular stock tailored to a plan's risk profile would have been different from the transaction that any plan actually did.  Furthermore, Mr. Dubinsky does not cite any sources that indicate what the pension plans' risk tolerances were or that the trades were not tailored to meet them.

27.    In short, the structured nature of the U.S. pension plan trades facilitated by the Solo Custodians is consistent with the arbitrage strategy that the plans pursued and, contrary to the SKAT Experts' assertions, the structured nature of the pension plans trades or automated trading does not support the assertion that the trades were fake.

## IV.    THE ANALYZED TRANSACTIONS FOLLOWED NUMEROUS ACCEPTED MARKET PRACTICES AND ARE NOT FAKE SIMPLY BECAUSE OF THE USE OF ANY NON-STANDARD TERMS

28.    Below, I provide a brief overview of several practices that the Analyzed Transactions followed.  The Analyzed Transactions involve the initiation and unwind of three types of transactions: 1) stock trading, 2) hedging of the long stock positions via flex futures and forward contracts, and 3) securities lending.[43]

29.    I discuss each of the three transactions below and address several of the SKAT Experts' analyses of purported irregularities in the transactions.  I find the SKAT Experts' analyses to be flawed and that they fail to demonstrate that the pension plan trades were fake.

---

[42] Dubinsky Report ¶207.

[43] *See* Initial Carr Report, Sections III-V for a detailed discussion of stock trading, hedging stock positions, and securities lending.

Rebuttal Report of Emre Carr, Ph.D., CFA

### A. Both Stock and Flex Futures Trading Followed Accepted Market Practices and IDBs Earned Commission On Their Trades

#### i. Stock Trading

30. With respect to stock trading, when an investor purchases or sells shares of a stock, it involves 1) trade execution, 2) clearance, and 3) settlement.[44]

31. As I explained in the Initial Carr Report, an investor places an order to buy (or sell) shares of an issuer through an executing broker, with trade execution occurring when a seller agrees to sell, and a buyer agrees to buy a security in a specified quantity at a specified price. The trades can be executed on a stock exchange or through bilateral trading via broker-dealers in the OTC market. Economic risk is assumed by the buyer of shares as soon as the trade is executed. The Analyzed Transactions were executed OTC by an executing broker and then given up to a Solo Custodian for clearing and settlement.[45]

32. It is normal market practice for an investor to receive a trade confirmation from the executing broker when a stock trade is executed.[46] As shown in **Figure 2** below, the RJM Plan received a trade confirmation from FGC Securities LLC for its purchase of MAERSKB shares. As noted in the Initial Carr Report, a trade confirmation is evidence that the trade was executed and of the terms of execution.[47]

33. Mr. Dubinsky ignores the common market practice of give-up arrangements and misrepresents the Solo Capital's trade approval issued under the give-up agreement to be the trade confirmation.[48] I present a comparison of the emails that Mr.

---

[44] *See id.* at Section III for a detailed discussion of stock trading.

[45] *Id.* at ¶¶38-39.

[46] *Id.* at ¶35.

[47] *Id. See also* Association for Financial Markets in Europe, "Post Trade Explained -The Role of Post-Trade Services in the Financial Sector," February 2015, Appendix 2 – Trade Confirmation; *see also* U.S. Securities and Exchange Commission, "Investor Bulletin: How to Read Confirmation Statements" (September 27, 2012), *available at* https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-62 (last accessed on December 28, 2021) (explaining "What is a Confirmation Statement?").

[48] Dubinsky Report Figures 9 and 10.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

Dubinsky represents as the trade confirmations in Figure 10 of his report and the corresponding actual trade confirmations issued by FGC Securities in **Exhibit 2**.

**Figure 2: Trade Confirmation from FGC Securities to the RJM Plan**[49]

FGC

FGC SECURITIES LLC
12 Desbrosses Street
New York, NY 10013
e: execution@fgcsecurities.com

CLIENT: RJM CAPITAL PENSION PLAN
REF #: FUTL-20130411-0007-A
DATE: April 11, 2013

**CASH EQUITY CONFIRMATION**

Client and FGC Securities agree that this confirms the terms and conditions of the following Cash Equity Transaction:

| | |
|---|---|
| Transaction Type Type: | **CASH EQUITY (STOCK)** |
| Listed / OTC | **LISTED** |
| Trade Date: | **April 11, 2013** |
| Client: | **RJM CAPITAL PENSION PLAN** |
| Email: | **adam@rjmcapitalp.com** |
| Buy / Sell: | **BUY** |
| Stock Description: | **MAERSKB DC \| AP MOELLER-MAERSK A/S-B \| 4253048** |
| Exchange: | **Copenhagen** |
| Share Quantity: | **10,400** |
| Trade Currency: | **DKK** |
| Trade Price: | **43,680.2893** |
| Trade Notional: | **454,275,008.72** |

| | | |
|---|---|---|
| Commission: | 11,356.88 | DKK |
| USD FX: | 5.69 | |
| **Commission** | **1,995.94** | **USD** |

**To be invoiced montly*

*We thank you for the opportunity to have been of service to you and trust that the above correctly represents your understanding of the transaction in question. Failure to object in writing to the transaction confirmed above by the earlier of 24 hours after your receipt of this confirmation or prior to 9 a.m. local market time on the settlement date shall be deemed your agreement to the correctness of this confirmation. Please note we have acted only as agent in this transaction and are not responsible for the financial viability of any counterparties we have matched you with nor are we responsible for the performance of this or any other transaction we have arranged. You*

Regards,
**FGC Securities**

Highly Confidential MPSKAT00077419

**Rebuttal Report of Emre Carr, Ph.D., CFA**

34. As the trade confirmation shows, the IDB earned a commission of $1,995.94 on the trade. If the trade was fictitious, there would be no reason for the pension plans to pay commissions to brokers for execution.

35. As part of executing stock trades, the use of executing brokers and clearing brokers by a customer such as a pension plan through a give-up agreement is a common industry practice and accepted arrangement.[50]

36. The pension plans used an industry-standard template as part of their give-up arrangements.[51] **Figures 3** and **4** below show acknowledgment and approval of equity transactions by the clearing broker (Solo, which also served as the custodian) sent to the RJM Plan, in accordance with the standard industry give-up agreement.[52]

---

[49] MPSKAT00077418-9 at MPSKAT00077419. Note that this is an accurate example of a trade confirmation that the plans received from their brokers. Mr. Dubinsky's report often cites to trade approval emails, *e.g.*, Dubinsky Report, Fig. 12, rather than the formal trade confirmation.

[50] Initial Carr Report ¶¶40-41.

[51] *See id.* at ¶¶39-43 for general discussion of give-up agreements and as it pertains to the RJM Plan transaction. *See also* Initial Carr Report, Exhibit 9 that compares and demonstrates that there are no significant differences between the give-up agreement used by the RJM Plan and the standard industry template called the International Uniform Brokerage Execution Services ("Give-Up") Agreement (Trader Version 2008).

[52] Once a stock trade is executed, the trade is subsequently cleared and settled. The clearing process involves confirming transactions details (*e.g.*, security identifier, side of each party (buy or sell), trade price, trade quantity, and settlement date) between the buyer and the seller. After the trade is cleared, the trade is settled. Settlement refers to the delivery of securities from the seller to the buyer, and the delivery of cash due, if any, on the transaction from the buyer to the seller. I discuss the clearing and settlement of the trades later in §VIII of this report.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 3: Solo's Acknowledgement of Transaction sent to the RJM Plan**[53]

| From: | solotradeapprovals@solo.com |
| Sent: | Thursday, April 11, 2013 7:40 AM |
| To: | adam@RJMCapitalp.com  solotradeapprovals@solo.com |
| Subject: | Account (RJM01) - Request for Trade Approval |

Dear Client,

Solo Capital Partners LLP acknowledges receipt of the requested trade below (*Trade*). The Trade will only be accepted for "give-up" to Solo Capital Partners LLP once the Trade is approved by Solo Capital Partners LLP. The Trade will not be accepted if Solo Capital Partners LLP does not provide its approval.

Details of Trade:

| | |
| --- | --- |
| **Trade Type** | Buy |
| **Ticker** | MAERSKB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 43,680.2893 |
| **Quantity/Contracts** | 10,400 |
| **Notional** | 454,275,008.7200 |
| **Trade Date** | 11/04/2013 |
| **Settlement Date** | 17/04/2013 |
| **Broker** | FGC Securities LLC |

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Highly Confidential                                                                        MPSKAT00077090

---

[53] MPSKAT00077090.

**CONFIDENTIAL**

**Rebuttal Report of Emre Carr, Ph.D., CFA**

## Figure 4: Solo's Approval of Transaction sent to the RJM Plan[54]

| From: | solotradeapprovals@solo.com |
|---|---|
| Sent: | Thursday, April 11, 2013 8:57 AM |
| To: | adam@RJMCapitalp.com |
| Cc: | execution@fgcsecurities.com; operations@fgcsecurities.com; solotradeapprovals@solo.com |
| Subject: | Account (RJM01) - Trade Approved |

Dear Client,

In relation to the trade referred to below (**Trade**), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| | |
|---|---|
| **Trade Type** | Buy |
| **Ticker** | MAERSKB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 43,680.2893 |
| **Quantity/Contracts** | 10,400 |
| **Shapes** | **Shape 1** 10,400 |
| **Notional** | 454,275,008.7200 |
| **Trade Date** | 11/04/2013 |
| **Settlement Date** | 17/04/2013 |
| **Broker** | FGC Securities LLC |

Highly Confidential                                                          MPSKAT00077295

**Rebuttal Report of Emre Carr, Ph.D., CFA**

37. The settlement term for the Analyzed Transactions used a T+4 settlement prior to October 6, 2014, and a T+3 settlement subsequent to October 6, 2014, as opposed to the T+3 and T+2 settlements, respectively, typically seen for trades executed on exchange.[55]  The Analyzed Transactions were executed OTC, and "[p]arties that trade stock OTC (or brokers acting on their behalf) may choose their settlement date, and can choose to settle before, on, or after the settlement date applicable to trades executed on an exchange."[56]

38. As I noted in the Initial Carr Report, there is nothing wrong with a plan using a longer settlement period for stock purchases.  VP Securities, the Denmark central securities depository ("CSD"), explicitly allows for a longer settlement period.[57]  As I stated in the Initial Carr Report: "In Denmark, a trade can settle the day it is made or up to 365 days post-trade."[58]

39. Relatedly, I observe that even Mr. Wade does not assert that the plans violated any market standard by using a longer settlement period; he merely notes that "[a]greeing to deliberately settle the trades with a settlement period longer than the market standard settlement cycle (*i.e.*, a T+4 basis instead when the market standard was T+3), … indicates that the contracts were bespoke [OTC] transactions."[59]  There is nothing wrong with trading OTC.

---

[54] MPSKAT00077295.

[55] Initial Carr Report ¶48.

[56] *Id.* ¶49.

[57] *Id.* n. 56 (discussing that "VP Securities ('VP'), the Denmark CSD, allows for settlement periods up to 365 days").

[58] *Id.* at ¶50.

[59] Wade Report ¶90.

Rebuttal Report of Emre Carr, Ph.D., CFA

### ii.    Flex Futures Contracts

40.    As I explained in the Initial Carr Report, the pension plans entered into either flex futures or forward contracts in the Analyzed Transactions to hedge the economic risk associated with price fluctuations in purchased shares.[60]

41.    I noted further that BClear was used to facilitate the flex futures transaction for the RJM Plan, as shown in the trade confirmation for the RJM Plan's flex future unwind transaction related to MAERSKB stock (see **Figure 5** below).  As the trade confirmation shows, the IDB earned a commission of $1,895.39 on the trade.

42.    BClear was, as of June 2014, the largest provider of flex futures products in Europe.[61]  Neither Mr. Wade nor Mr. Dubinsky states that BClear did anything improper or had any connection to Solo or Sanjay Shah.

---

[60] *See* Initial Carr Report, Section IV for a detailed discussion of hedging stock positions via flex futures and forward contracts.

[61] ISDA, "Central Clearing in the Equity Derivatives Market – An ISDA Study," June 2014, p. 7, *available at* https://www.isda.org/a/6PDDE/central-clearing-in-the-eqd-market-final.pdf (last accessed on December 17, 2021).